UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

EURO PACIFIC CAPITAL INC,
INDIVIDUALLY, AND IN ITS CAPACITY
AS INVESTOR REPRESENTATIVE AND
ATTORNEY-IN-FACT FOR BARBARA SUE
WILSON AND DAVID D. WILSON AS
TRUSTEES FOR THE BARBARA SUE
WILSON TRUST U/A 8/23/94; DOUGLAS
W. JOHNSON AS TRUSTEE FOR THE
DOUGLAS WILLIAM JOHNSON
REVOCABLE TRUST U/A 6/25/10; HEIDI
W. KEINE AND KEVIN KEINE; JANET D.
RUSSELL AS TRUSTEE FOR THE JANET
DICKINSON RUSSELL LIVING TRUST IS
A TRUST U/A 1/20/10; NFS/FMTC
ROLLOVER IRA FBO JERRY R. SPEAKS;
NFS/FMTC ROLLOVER IRA FBO ROBERT
M. WEISSBERG; POINT AUX CHENES LLC;
BRUCE WALKER RAVENEL; POM
INVESTMENTS; JEFF ARCHIBALD;
NORMAN E. APPERSON AND PAMELA
MCEACHERN AS TRUSTEES FOR THE
NORMAN E. APPERSON AND PAMELA
MCEACHERN TRUST, U/A 7/22/96;
THE DREW & RASKIN PROFIT SHARING
PLAN FBO STEPHEN RASKIN; CARLOS
A. MERINO AS TRUSTEE FOR THE
CARLOS ALFONSO MERINO REVOCABLE
LIVING TRUST U/A 12/4/96; BARBARA J.
PETERSON AS TRUSTEE FOR THE
BARBARA J. PETERSON REVOCABLE
TRUST U/A 2/4/00; CAROLYN R. LONG;
COREY SHANNON MCNAMEE; EVA
MARIE SALAS AS TRUSTEE FOR EVA M.
SALAS TRUST; JIMMIE C. WEST AND
CAROLYN E. WEST; JOSEPH MCCARTHEY
AND MIKI MCCARTHY; MARK DUGGER
AS ADMINISTRATOR FOR THE ALLSTATES
DRYWALL INC. EE S T; MICHAEL J.
HANRATTY AND LYNSAY F. HANRATTY;
MITCHELL MARTIN AND DEBORAH
MARTIN; NFS/FMTC ROTH IRA FBO
VIRGINIA C. ADAMS; NFS/FMTC SEP FBO

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:



USDC SDNY
DOCUMENT
FILED
DOC #:
DATE FILED  2/13/17

**REPORT AND RECOMMENDATION**

15-CV-359 (VSB) (KNF)

1

CARTER LAREN; NFS/FMTC SEP FBO          :
GERALD MONA; OLEKSANDR TUMKO            :
AND OKSANA TUMKO; THOMAS L.
INGRAM AND CARISSA INGRAM AS           :
TRUSTEES FOR THE INGRAM LIVING
TRUST U/A 11/2/05; TIMOTHY CRANE AS    :
TRUSTEE FOR THE TIMOTHY R. CRANE
TRUST; WILLIAM BRADLEY AS              :
ADMINISTRATOR FOR THE BRADLEY
ANESTHESIOLOGY PROFIT SHARING          :
PLAN; ART KLEPPEN AND KIMBERLY
KLEPPEN; BRENT PAULGER AND             :
SHARISSA PAULGER; KEVIN MOORE;
NFS/FMTC IRA FBO ROBERT STEPHEN        :
ADAMS; NFS/FMTC SEP IRA FBO GERALD
E. MANVILL; STEVE HOKE AND COLLEN      :
HOKE AS TRUSTEES FOR THE HOKE
LIVING TRUST U/A 4/19/02; ARNOLD       :
WILLIAM GOLDSCHLAGER AND NORA
GOLDSCHLAGER AS TRUSTEES FOR THE       :
GOLDSCHLAGER FAMILY TRUST U/A
6/24/04; UZZI REISS AND YAEL REISS AS  :
TRUSTEES FOR THE REISS FAMILY TRUST
U/A 12/29/88; JOHN A. RUPP AS TRUSTEE  :
THE JOHN A. RUPP TRUST U/A 3/9/ 07;
LAURA SMITH AND FORREST SMITH AS       :
TRUSTEES FOR THE CONNELLY JOHNSON
SMITH FAMILY TRUST U/A 4/2/09; MARC    :
A. PIERRE AS ADMINISTRATOR FOR
THE CENTER FOR PHYSICAL HEALTH         :
401 K PROFIT SHARING PLAN; NFS/FMTC
ROLLOVER IRA FBO LYNN ROLLINS          :
STULL; NFS/FMTC ROLLOVER IRA FBO
RONALD ALLEN MCCANN; NFS/FMTC          :
ROTH IRA FBO HELEN ERSKINE; PRASAD
REALTY CORP.; WILLIAM A. KARGES JR.    :
AS TRUSTEE FOR THE KARGES
REVOCABLE INTERVIVOS TRUST U/A         :
4/29/85; DAVID W. LARSON AND
JENIFFER L. LARSON; JOHN D. SMEAD;     :
MARK EDWARD SMEAD AS TRUSTEE
FOR THE MARK E. SMEAD REVOCABLE        :
LIVING TRUST U/A 11/17/95; NFS/FMTC
ROLLOVER IRA FBO BERTRAND BROOKS       :
CARDER; NFS/FMTC ROLLOVER IRA FBO

2

EDWIN BRUNO KAEHLER; RICHARD
GRIFF AND JACKINE GRIFF; BARBARA
SEIDEL AS TRUSTEE FOR THE
BARBARA GALLUN SEIDEL RESIDUAL
TRUST U/A 2/9/60; BERT HUNTSINGER;
CHRISTIANNA SEIDEL AS TRUSTEE
FOR THE CHRISTIANNA SEIDEL
PROPERTY TRUST U/A 11/5/99 FBO
CHRISTIANNA SEIDEL; DAVID BRISBIN
AS TRUSTEE FOR THE INNES BRISBIN
LIVING TRUST U/A 6/8/04; GEORGE
FELDMAN; GILBERT DOMINGUEZ AS
TRUSTEE FOR THE DOMINGUEZ TRUST
U/A 3/3/05; HEMENT KATHURI AS
ADMINISTRATOR FOR THE H.
KATHURIA INVESTMENT II P PLAN;
JIM ROBERT PUGH; KENNETH H. NASS
AND MAUREEN NASS AS TRUSTEES FOR
THE KENNETH H. & MAUREEN K. NASS
CHARI TRUST U/A 6/7/05; KK SWOGGER
ASSET MANAGEMENT; MAUREEN K.
NASS AND KENNTIH H. NASS AS
TRUSTEES FOR THE MAUREEN K. NASS
LIVING TRUST U/A 5/16/05; NFS/FMTC
IRA FBO DIANE D. SPOLUM; NFS/FMTC
ROLLOVER IRA FBO OF ANDRES
KEICHIAN; NFS/FMTC ROLLOVER IRA
FBO RALPH DALE EDSON; ROBERT T.
FOSS AND MARGARET FOSS AS
TRUSTEES FOR THE ROBERT &
MARGARET FOSS REVOCABLE TRUST
U/A 3/31/04; SHELBY JORDAN AND
BECKY JORDAN; TRISHA L. FRERES
AND THEODORE KYLE FRERES AS
TRUSTEES FOR THE TRISHA L. FRERES
LIVING TRUST U/A 3/31/04; WALTER
FRIESEN; WILLIAM J. CYR; WILLIAM
TEN BRINK AS TRUSTEE FOR THE TEN
BRINK TRUST U/A 10/2/86; WILLIAM
WILEY AND MARIANNE WILEY AS
TRUSTEES FOR THE WILEY FAMILY
LIVING TRUST U/A 7/19/95;
BUCKTHORN LLC; MARC BIENSTOCK
AND JENNY I. BIENSTOCK; MARK
STERIN; NANCY L. BENSON AS

:

:

:

:

:

:

:

:

:

:

:

:

:

:

:

:

:

:

:

:

3

TRUSTEE FOR THE NANCY L. BENSON
LIVING TRUST U/A 11/11/02; NFS/FMTC
ROLLOVER IRA FBO JAMES A.                          :
TAMBORELLO; NFS/FMTC ROLLOVER
IRA FBO RICHARD DAVIS MOORE;                       :
SKEE GOEDHART AS TRUSTEE FOR THE
PARACELSUS REVOCABLE TRUST U/A                     :
7/25/97; SUSAN C. CULLEN; GAYLE M.
SANDERS AND DEBORAH SANDERS AS                     :
TRUSTEES FOR THE GAYLE M. SANDERS
FAMILY TRUST REVOCABLE TRUST U/A                   :
8/15/02; MARC W. LEVIN AND SUSAN G.
LEVIN; NFS/FMTC ROLLOVER IRA FBO                   :
DONALD T. GLASER JR.; DAVID ALAN
SCULLY; JERRY F. MCWILLIAMS;                        :
MICHAEL SCULLY; NFS/FMTC
ROLLOVER IRA FBO TODD HOWARD                        :
OVERGARD; DAVID ARITA; DEBORAH
FOREMAN AS TRUSTEE FOR THE                          :
DEBORAH D. FOREMAN TRUST U/A
9/29/94; HCR INVESTMENTS INC.; LYNN               :
HAVLIK; BARBARA S. MEISTER AS
TRUSTEE FOR THE MEISTER                             :
NON-EXEMPT MARITAL TRUST U/A
11/17/83; BRIAN S. BEHAN; CYNTHIA                  :
KESSLER AND JAMES KESSLER;
NFS/FMTC IRA FBO HOWARD W. WAHL;                   :
NORMAN S. KRAMER AND LINDA L.
KRAMER; QUINCY MURPHY INC.;                         :
ROBERT L. BISHOP; SCOTT DAVIES
AND MISTY DAVIS AS TRUSTEES FOR                     :
THE SCOTT & MISTY DAVIES LIVING
TRUST U/A 6/28/07; BARBARA HEARST;                 :
CINDY J. LEWIS AS TRUSTEE FOR THE
CINDY J. LEWIS DECLARATION OF                       :
TRUST U/A 3/11/93; JACK ABRAMS AND
MARGO ABRAMS AS TRUSTEES FOR                        :
THE JACK ABRAMS PENSION PLAN 1;
JIM GRIFFIN AS CUSTODIAN FOR THE                    :
MICHELLE E. GRIFFIN UTMA OH; JIM
GRIFFIN AS CUSTODIAN FOR THE                        :
DANIEL J. GRIFFIN UTMA OH; JULIA
L. GRIFFIN; NFS/FMTC IRA FBO                        :
LEONARD SIEGEL; NFS/FMTC IRA FBO
ROYCE V. JACKSON; PETER D. SCHIFF;

4

R. STEVEN SMITH; RICHARD
POTAPCHUK; SCOTT R. GRIFFIN; AMY
J. STEFANIK AS TRUSTEE FOR THE AMY
J. STEFANIK REVOCABLE TRUST U/A
2/6/01; ANDREW P. COOK AND SUSAN
R. COOK; CHARLOTTE J. BELASCO;
JEAN A. DAVIDS-OSTERHAUS
REVOKABLE TRUST U/A 10/3/07;
LARRY GUAGLIARDO; MARK A.
OSTERHAUS AS TRUSTEE FOR THE
MARK OSTERHAUSE REVOCABLE
TRUST U/A 10/31/07; RICHARD P.
ANTHONY III AND KIMBERLY J.
ANTHONY; STEVEN JAY EPSTEIN.,

     Plaintiff,

   -against-

YAYI INTERNATIONAL INC.,

     Defendant.

-------------------------------------------------------------------X

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE VERNON S. BRODERICK, UNITED STATES DISTRICT JUDGE

## INTRODUCTION

This is a breach of contract action by a California corporation, Euro Pacific Capital Inc.,

"individually and in its capacity as investor representative," against a Delaware corporation,

Yayi International, Inc. ("Yayi"). The plaintiff asserts the following causes of action in the first-

amended complaint: (1) "First Cause of Action (Investors – for Breach of Contract)"; (2)

"Second Cause of Action (Investors – Breach of Covenant)"[1]; (3) "Third Cause of Action

(Investors – Breach of the Covenant of Good Faith and Fair Dealing)"; and (4) "Fourth Cause of

---

[1] The plaintiff's second cause of action is not subject to the instant inquest because the plaintiff seeks injunctive relief in connection with it.

Action (Euro Pacific –Defendants'[2] [sic] Breach of Contract – Third Party Beneficiary)." In the

demand clause of the first-amended complaint, the plaintiff seeks the following: (1) "in its

capacity as Investor Representative and attorney in fact for the Investors, damages in the amount

of $8,920,000.00 on Counts I and III of the Complaint"; (2) "individually, damages in the

amount of $1,000,000 on Count IV of the Complaint"; and (3) "costs, expenses, and attorneys'

fees Plaintiff incurred in prosecuting its claims." Before the Court are the plaintiff's unopposed

submissions in connection with an inquest to determine the amount of damages, if any, upon the

defendant's default: (a) "Plaintiffs' Memorandum of Law In Support of Inquest for Damages"[3];

(b) "Affirmation of Christopher L. Ayers ['Ayers'] in Support of Inquest Memorandum"; (c)

"Affidavit of Peter Chema ['Chema'] In Support of Plaintiffs' Inquest Memorandum"; and (d)

"Plaintiffs' [Proposed] Findings of Fact and Conclusions of Law."

## PLAINTIFF'S INQUEST SUBMISSIONS

The plaintiff contends:

> On or about September 27, 2010, the Investors and Yayi entered into promissory
> notes (the "Notes") whereby Yayi promised to pay Investors a total of $8,920,000
> (the "Principal") at nine percent (9%) interest per annum. . . . Pursuant to the Notes,
> "the principal amount hereof and all accrued but unpaid interest shall be paid in full
> to the Holder on the three (3) year anniversary of the date of closing of the
> Minimum Amount" (hereinafter the "Maturity Date"). . . . Simultaneously and in
> conjunction with the Note, on or about September 27, 2010, the parties entered into
> a Securities Purchase Agreement ("SPA"). . . . The "Minimum Amount" as cited in
> the Notes was tendered upon the execution of the SPA. As such, pursuant to the
> aforementioned agreements, the Maturity Date for the Note was September 27,
> 2013. . . . Section 12 of the Notes also states that "[t]he Company agrees that, in the
> Event of Default, to reimburse the Holder for all reasonable costs and expenses
> (including reasonable legal fees of one counsel) incurred in connection with the

---

[2] The plaintiff made claims against only one defendant, Yayi International Inc.

[3] The first-amended complaint, Docket Entry No. 23, which is the operative pleading in this action, names only one
plaintiff in the caption, Euro Pacific Capital Inc, "individually, and in its capacity as investor representative," and
alleges, in the section entitled "The Parties" that the plaintiff "is the Investor Representative and attorney in fact for
the Investors, and authorized to act on their behalf." Accordingly, any use by the plaintiff in its inquest submissions
of the plural form "Plaintiffs" is improper.

enforcement and collection of this Note." . . . Defendant defaulted on the Notes as it ceased making interest payments after September 30, 2012 — more than a year before the Maturity Date — and subsequently failed to tender any of the principal amount of the monies due and owing under the Notes. Thus, Defendant is required to pay Plaintiff the monies due and owing under the Notes with interest at a rate of 9% per annum thereon. . . . Under the SPA, Euro Pacific is the "Investor Representative" and "Placement Agent" of all Shareholders and is their lawful agent and attorney-in-fact to act on their behalf.

In a footnote to its memorandum of law the plaintiff contends: "This debt is convertible to an equity stake in Yayi's company pursuant to Section 5 of the Note . . . To date the Investors have not converted the debt to equity pursuant to the Note." The plaintiff asserts that the investors are owed "a total of $8,920,000" in principal, and "[t]he interest on the outstanding Notes calculated from the date of the Notes, when interest commenced, through February 19, 2016 is $4,337,319.45. . . . Accordingly, the Plaintiffs are damaged in the amount of $13,257,319.45 inclusive of interest for breach of the Notes through February 19, 2016. This amount puts the alleged investors in the same position had Yayi complied with its payment obligations." The plaintiff asserts that, "[i]n its capacity as Placement Agent," it "is an intended third party beneficiary to the Notes and SPA." As a result of the defendant's failure "to pay the monies owed under the terms of the Notes," the plaintiff "suffered damages in the amount of $53,014.88 for business losses; and, based upon established precedent, Euro Pacific is entitled to $1,000,000 for reputational harm and lost profits, plus pre-judgment interest thereon in the amount of $103,859.00 calculated at the statutory rate of nine percent (9%) from the commencement of this action on January 16, 2015 through February 19, 2016." Moreover, the plaintiff incurred $65,937.02 in attorney's fees and costs to date.

Chema states in his "affidavit based upon [his] personal knowledge, unless otherwise indicated," that he is the general counsel to the plaintiff and that "[o]n or about September 27,

7

2010, the Investors and Yayi entered into promissory notes (the 'Notes') whereby Yayi promised

to pay Investors a total of $8,920,000 (the 'Principal') at nine percent (9%) interest per annum.

Annexed hereto as exhibit A is a copy of the Notes." Exhibit A to Chema's affidavit is a

document entitled "YAYI INTERNATIONAL INC. 9% CONVERTIBLE PROMISSORY

NOTE," dated September 27, 2010, in the amount of "US $100,000." Exhibit A consists of:

thirteen pages numbered 1 through 13 and the following four unnumbered pages: (1) a signature

page containing a signature by "YAYI INTERNATIONAL INC."; (2) an uncompleted "Exhibit

A YAYI INTERNATIONAL INC. NOTE CONVERSION NOTICE"; (3) "Schedule 8(a)

Existing Indebtedness (As of August 31, 2010)"; (4) "Schedule 8(f) Sales of Receivables; Sale –

Leasebacks"; and (5) "Schedule 8(g) Capital Expenditures." Chema states that "[p]ursuant to the

Notes, 'the principal amount hereof and all accrued unpaid interest shall be paid in full to the

Holder on the three (3) year anniversary of the date of closing of the 'Minimum Amount'

(hereinafter the 'Maturity Date')." Exhibit A contains the following text, in relevant parts:

> FOR VALUE RECEIVED, Yayi International Inc., a Delaware corporation (the
> "Company"), promises to pay to AMY J. STEFANIK TTE AMY J STEFANIK
> REVOCABLE TRUST U/A 2/6/01 (the "Holder"), the principal sum of ONE
> HUNDRED THOUSAND DOLLARS ($100,000) (the "Principal") in lawful
> money of the United States of America, with interest payable thereon at the rate of
> nine percent (9%) per annum. The principal amount hereof and all accrued but
> unpaid interest thereon shall be paid in full to the Holder on the three (3) year
> anniversary of the date of closing of the Minimum Amount (the "Maturity Date").
> Capitalized terms used herein but not defined herein shall have the meaning
> ascribed to them in that certain Securities Purchase Agreement, dated of even date
> herewith (the "SPA"), pursuant to which the Holder is acquiring this Note. The
> following is a statement of the rights of the Holder of this Note and the terms and
> conditions to which this Note is subject, and to which the Holder, by acceptance of
> this Note, agrees:
>> 1.   Series.   This Note is one of a series of Notes of the Company in the
>>        aggregate principal amount of a minimum of Six Million Dollars
>>        ($6,000,000) and up to a maximum of Ten Million Dollars ($10,000,000)
>>        (collectively, the "Notes") as described in that certain Confidential Private
>>        Placement Memorandum, dated August 30, 2010, delivered to the Holder

8

in connection with the transactions contemplated by the SPA (the "Memorandum").

2. <u>Principal Repayment</u>. The outstanding principal amount of this Note shall be payable on the Maturity Date, unless this Note has been earlier converted or redeemed as described below.

3. <u>Interest</u>.

   (a) <u>Computation</u>. Interest (the "Interest") shall accrue on the outstanding principal amount of this Note from the date hereof until such principal amount is repaid in full at the rate of nine percent (9%) per annum, payable semiannually in arrears on the last day of the first and third calendar quarters (i.e. March 31 and September 30) commencing March 31, 2011, subject to earlier conversion or redemption of the Note. For purposes of clarity, the initial interest payment shall consist of accrued interest from the date of issuance of the Note through March 31, 2011. All computations of the interest rate hereunder shall be made on the basis of a 360-day year of twelve 30-day months. In the event that any interest rate provided for herein shall be determined to be unlawful, such interest rate shall be computed at the highest rate permitted by applicable law. Any payment by the Company of any interest amount in excess of that permitted by law shall be considered a mistake, with the excess being applied to the principal of this Note without prepayment premium or penalty.

Exhibit A, Section 6(a) provides that "<u>Non-Payment</u>" is one of the "Events of Default": "The Company shall default in the payment of the principal of, or accrued interest on, this Note as and when the same shall become due and payable, whether by acceleration or otherwise." Exhibit A, Section 12, provides, in pertinent part: "The Company agrees that, in the event of an Event of Default, to reimburse the Holder for all reasonable costs and expenses (including reasonable legal fees of one counsel) incurred in connection with the enforcement and collection of this Note." Exhibit A, Sections 13 and 14 provide:

13.   <u>Payment</u>. All payments with respect to this Note shall be made in lawful money of the United States of America, at the address of the Holder as of the date hereof or as designated in writing by the Holder from time to time. The receipt by the Holder of immediately available funds shall constitute a payment of principal and interest hereunder and shall satisfy and discharge the liability for principal and interest on this Note to the extent of the sum

9

represented by such payment. Payment shall be credited first to the accrued interest then due and payable and the remainder applied to principal.

14. Assignment. The rights and obligations of the Company and the Holder of this Note shall be binding upon, and inure to the benefit of, the successors and permitted assigns of the parties hereto. The Holder may assign, pledge or otherwise transfer this Note or any interest therein with prior notice to the Company. Interest and principal are payable only to the registered Holder of this Note on the books and records of the Company.

Chema states that, "[s]imultaneously and in conjunction with the Note, on or about September 27, 2010, the parties entered into a Securities Purchase Agreement ('SPA'). Annexed hereto as Exhibit B is a copy of the SPA." Exhibit B, entitled "SECURITIES PURCHASE AGREEMENT," is a 45-page document, with 42 pages numbered 1 through 42 and three unnumbered pages. The following relevant text appears on the first numbered page:

> This SECURITIES PURCHASE AGREEMENT (this "Agreement") is dated as of September 27, 2010, among Yayi International Inc., a Delaware corporation (the "Company"), the investors listed on the Schedule of Investors attached hereto as Exhibit A and identified on the signature pages hereto (each, an "Investor" and collectively, the "Investors") and, with respect to certain sections hereof, Euro Pacific Capital, Inc. (the "Placement Agent").
> WHERAS, this Agreement has been entered into pursuant to the terms of the Company's Confidential Private Placement Memorandum, dated August 30, 2010 (together with any and all amendments and/or supplements thereto, the "Memorandum");
> WHEREAS, subject to the terms and conditions set forth in this Agreement and in reliance upon the applicable exemptions from securities registration under the Securities Act (as defined below), the Company desires to issue and sell to each Investor, and each Investor severally and not jointly, desires to purchase from the Company certain securities of the Company, as more fully described in this Agreement.

SPA's "Article 1. Definitions" provides, in pertinent parts: (i) "'Investment Amount' means, with respect to each Investor, the Investment Amount indicated on such Investor's signature page to this Agreement, which is also reflected on the Schedule of Investors attached hereto as Exhibit A"; (ii) "'Minimum Amount' means Units equal to at least the amount of $6,000,000 are

10

required to be sold at the First Closing within the time period set forth in the Memorandum"; and

(iii) "'Transaction Documents' means this Agreement, the Memorandum, the Registration Rights Agreement, the Closing Escrow Agreement, the Make Good Escrow Agreement, the Notes, the Series F Warrants and the Placement Agent Warrants and any other documents or agreements executed in connection with the transactions contemplated hereunder." SPA's "Article 2. Purchase and Sale" provides:

> 2.2 <u>Closing</u>.
> (a)   <u>First Closing</u>. Subject to the terms and conditions set forth in this Agreement, the Company shall issue and sell to each Investor, and each such Investor shall, severally and not jointly, purchase from the Company on or before [*] , 2010 (the "First Closing Date") such number of Units set forth on the respective signature pages attached hereto, which will be reflected opposite such Investor's name on <u>Exhibit A</u> (the "First Closing"). Units equal to at least the Minimum Amount are required to be sold at the First Closing within the time period set forth in the Memorandum.
> (b)   <u>Subsequent Closing(s)</u>. In the event that the Maximum Amount is not raised at the First Closing, the Company and the Placement Agent may mutually agree to have one or more subsequent Closings of the Offering (each, a 'Subsequent Closing') until the first to occur of: (i) the Maximum Amount being raised and (ii) the Outside Date occurs. . . .   The date of any Subsequent Closing is hereinafter referred to as a "Subsequent Closing Date"[].
> (c)   <u>Closing</u>. The First Closing and any applicable Subsequent Closings are each referred to in this Agreement as a "Closing." The First Closing Date and any Subsequent Closing Date are sometimes referred to herein as a "Closing Date." The Closing at which the Maximum Amount is raised, or which is the last Closing prior to the Outside Date, is referred to as the "Final Closing." The date of the Final Closing is referred to as the "Final Closing Date."

SPA's Section 2.3 provides that "[a]t each closing, the Company shall deliver or cause to be delivered to each Investor," <u>inter</u> <u>alia</u>, "a Note." SPA's Section 2.4. provides: "The Notes shall have the terms and conditions and be in the form attached hereto as <u>Exhibit F</u>. Upon an Event of Default (as defined in the Notes), the Investors shall have, in addition to any rights provided

hereunder, the rights provided them under the Transaction Documents." SPA's Article 2

provides:

> 2.8. <u>Investor Representative</u>.  Each Investor, severally and not jointly, hereby appoints the Placement Agent (together with its permitted successors, and in this context, the "Investor Representative"), as its true and lawful agent and attorney-in-fact to without the need for any further consent or further action on the part of any Investor: (a) enter into any agreement in connection with the transactions contemplated by this Agreement and any transactions contemplated by the Transaction Documents, (b) to accept delivery of the Notes and Series F Warrants comprising the Units purchased hereunder; (c) exercise all or any of the powers, authority and discretion conferred on such Investor under this Agreement or any of the Transaction Documents, (d) waive any terms and conditions of this Agreement or any of the Transaction Documents, including, but not limited to, waive any negative or affirmative covenants of the Company contained in any Transaction Document, (e) give and receive notices on such Investor's behalf and to be such Investor's exclusive representative with respect to any matter, suit, claim, action or proceeding arising with respect to any transaction contemplated by this Agreement or any Transaction Document, and the Investor Representative agrees to act as, and to undertake the duties and responsibilities of, such agent and attorney-in-fact. This power of attorney is coupled with an interest and irrevocable.

SPA's "Article 6. Miscellaneous" provides:

> 6.2. <u>Entire Agreement</u>. The Transaction Documents, together with the Exhibits and Schedules thereto, contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements, understanding, discussions and representations, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.
>
> . . .
>
> 6.8. <u>No Third-Party Beneficiaries</u>. This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, except as otherwise set forth in Section 4.7 (as to each Investor Party). Notwithstanding the foregoing, the Investor Representative may rely on the representations and warranties of the Company and the Investors set forth in this Agreement and is an intended third party beneficiary of this Agreement and have all of the rights of an "investor" under this Agreement.

The last three unnumbered pages of Exhibit B appear to be signature pages containing signatures

of the following persons: (a) Li Liu, Chief Executive Officer and President, "COMPANY: YAYI

INTERNATIONAL INC."; (b) Fung Shek, Director, "Solely with respect to Section 4.11 herein: MAKE GOOD PLEDGOR: GLOBAL ROCK STONE INDUSTRIAL LTD."; and (c) Gordon McBean, Head of Capital Markets, "INVESTORS: The Investors executing the Signature Page in the form attached hereto as Annex A and delivering the same to the Company or its agents shall be deemed to have executed this Agreement and agreed to the terms hereof. Solely with respect to Sections 2.7, 5.1, 6.4, 6.5(a) and 6.8 herein: INVESTOR REPRESENTATIVE: EURO PACIFIC CAPITAL, INC." In his affidavit, Chema repeats, almost verbatim, the allegations in the first-amended complaint, which are also contained, almost verbatim, in the plaintiff's memorandum of law in support of the inquest. Chema contends that "Euro Pacific suffered damages to for business losses in the amount of $53,014.88 from investments in research, due diligence, consulting and development and marketing," and "suffered damages in reputational harm."

Ayers states in his affirmation that he is an attorney with Anderson Kill P.C., the plaintiff's attorney. He contends that, "[t]he total fees and costs to date is [sic] $65,937.02," and "[t]he billing rate for the attorneys, law clerks, and paralegals working on the instant litigation ranged from $150 per hour for a paralegal to $715 per hour for a partner." Attached to Ayers's affirmation are: (i) Exhibit A, "a chart outlining the total fees and costs to date related to this Action"; and (ii) Exhibit B, "a copy of the January 21, 2015 in *Peter Schiff v. China Nutrifruit Group Ltd.*" Exhibit A consists of two unnumbered pages, each containing a table. Exhibit A's first page table is entitled: "Time Recap Summary by Timekeeper [102824, EPC04 – YAYI INTERNATIONAL, INC.] Client: 102824 – EURO PACIFIC CAPITAL 7/7/2016 4:20:02 PM. Exhibit A's second page table is entitled: "Time Recap Summary by CostCode [102824, EPC04 – YAYI INTERNATIONAL, INC.] Client: 102824 – EURO PACIFIC CAPITAL 7/7/2016

13

4:20:02 PM. Exhibit A's first page table contains the following categories: "Timekeeper," "Work Hours," "Work Amount," "Bill Hours," "Bill Amount," and "Description." Under the "TOTAL" part of the table on Exhibit A's first page, it is indicated that nine persons expended 253.90 "Work Hours" and the total "Bill Amount" is "62049.00." The following information is listed in "Description," "Bill Hours" and "Bill Amount[s]" in Exhibit A's first page table: (1) Laura Kuck, 1.20 hours, $294.00; (2) David Graff, 13.10 hours, $4,912.50; (3) Rachael Kierych, 17.50 hours, $4,375.00; (4) Christopher Paolino, 57.10 hours, $14,275.00; (5) Allen Wolff, 5.70 hours, $2,137.50; (6) Alexander I. Itt, 71.50 hours, $17,875.00; (7) Christopher Ayers, 67.50 hours, $16,875.00; (8) Ryan Reckhow, 3 hours, $405.00; and (9) Brooke Ford, 4.50 hours, $900.00.

Exhibit A's second page table contains the following categories: "CostCode," "Worked Amount," "Billed Amount," and "Description." Under the "TOTAL" part of the table on Exhibit A's second page, "3888.02" is indicated as "Billed Amount" for the following: "airfreight," "filing or witness fees," "DI – fax charges," "local travel," "library & legal research Lexis Nexis," "meals (in-office OT)," "DI – postage," "service of papers," "meals away & travel exp.," "DI – photocopying" and "AP – photocopying." Exhibit B contains a "Notice of Settlement" and "Proposed Judgment" from an unrelated state-court action.

## LEGAL STANDARD

"Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true. The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999) (citation omitted). Establishing the appropriate amount of damages involves two steps: (1)

14

"determining the proper rule for calculating damages on . . . a claim"; and (2) "assessing

plaintiff's evidence supporting the damages to be determined under this rule." Id. When

assessing damages, a court cannot "just accept [the plaintiff's] statement of the damages"; rather,

damages must be established "with reasonable certainty." Transatlantic Marine Claims Agency,

Inc. v. Ace Shipping Corp., Div. of Ace Young Inc., 109 F.3d 105, 111 (2d Cir. 1997).

"A default judgment must not differ in kind from, or exceed in amount, what is

demanded in the pleadings." Fed. R. Civ. P. 54(c).

> The theory of this provision is that the defending party should be able to decide on
> the basis of the relief requested in the original pleading whether to expend the time,
> effort, and money necessary to defend the action. It would be fundamentally unfair
> to have the complaint lead defendant to believe that only a certain type and
> dimension of relief was being sought and then, should defendant attempt to limit
> the scope and size of the potential judgment by not appearing or otherwise
> defaulting, allow the court to give a different type of relief or a larger damage
> award.

> 10 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL
> PRACTICE AND PROCEDURE § 2663 (4th ed. 2014).

"[N]otice that comes at the inquest stage" is not sufficient in itself to satisfy the notice

requirement of Rule 54(c) and to "permit a plaintiff in a default action to recover for damages

not claimed in the complaint." Silge v. Merz, 510 F.3d 157, 161 (2d Cir. 2007). The Second

Circuit explained that Rule 54(c) "is a sensible rule" and a plaintiff who fails to specify particular

relief "in the demand clause" of the complaint is exposed to "the risk that his damages would be

limited in the event of default." Id. at 160. Where the complaint does not include a demand for

prejudgment interest, "the conventional additional demand for 'such other and further relief as

the Court deems just and proper' does not constitute a demand for prejudgment interest." Id.

15

State law governs substantive damages issues in a case over which a federal court exercises diversity jurisdiction. See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 437, 116 S. Ct. 2211, 2224 (1996). Damages for breach of contract "are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed." Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C., 91 N.Y.2d 256, 261, 669 N.Y.S.2d 520, 522 (1998). Where a plaintiff seeks to recover damages for the defendant's breach of contract, based on the terms of an agreement, courts look to the parties' agreement as"[t]he best evidence of what parties to a written agreement intend is what they say in their writing." Slamow v. Del Col, 79 N.Y.2d 1016, 1018, 584 N.Y.S.2d 424, 425 (1992). Thus, "where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language." R/S Assocs. v. N.Y. Job Dev. Auth., 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358, 360 (2002).

"The awarding of attorneys' fees in diversity cases . . . is governed by state law." Grand Union Co. v. Cord Meyer Dev., 761 F.2d 141, 147 (2d Cir. 1985) (citations omitted). Under New York law, "in the absence of any pertinent contractual or statutory provision with respect to the recovery of amounts expended in the successful prosecution or defense of an action, each party is responsible for its own legal fees." Chapel v. Mitchell, 84 N.Y.2d 345, 349, 618 N.Y.S.2d 626, 628 (1994). "[A]n award of attorney's fees pursuant to . . . a contractual provision may only be enforced to the extent that the amount is reasonable and warranted for the services actually rendered." People's United Bank v. Patio Gardens III, LLC, 143 A.D.3d 689, 691, 38 N.Y.S.3d 262, 264 (App. Div. 2nd Dep't 2016). In determining reasonable attorney's fees in New York, courts consider the following factors: "time and labor required, the difficulty of the questions involved, and the skill required to handle the problems presented; the lawyer's

16

experience, ability and reputation; the amount involved and benefit resulting to the client from the services; the customary fee charged by the Bar for similar services; the contingency or certainty of compensation; the results obtained; and the responsibility involved." Estate of Freeman v. Freeman, 34 N.Y.2d 1, 9, 355 N.Y.S.2d 336, 341 (1974).

## APPLICATION OF LEGAL STANDARD

The plaintiff's memorandum of law, Chema's affidavit and proposed findings of facts and conclusions of law are almost identical, each reciting, almost verbatim, the allegations in the first-amended complaint. As a result, Chema's affidavit contains, largely, impermissible legal conclusions, opinions and factual assertions made without personal knowledge. The first-amended complaint asserts the breach of a single note, dated September 27, 2010, and SPA, dated September 27, 2010. Inconsistent with the first-amended complaint, the plaintiff's memorandum of law and Chema's affidavit: (a) contend that "[o]n or about September 27, 2010, the Investors and Yayi entered into promissory notes (the 'Notes') whereby Yayi promised to pay Investors a total of $8,920,000 (the Principal) at nine percent (9%) interest per annum"; and (b) refer, repeatedly, to "the Notes" in the plural form, while also referring to "the Note" in the singular form. In support of Chema's statement that "[o]n or about September 27, 2010, the Investors and Yayi entered into promissory notes (the 'Notes') whereby Yayi promised to pay Investors a total of $8,920,000 (the Principal) at nine percent (9%) interest per annum," Chema submitted "Exhibit A," which he claims is "a copy of the Notes." However, Exhibit A to Chema's affidavit is a copy of one note only, dated September 27, 2010, in the amount of "US 100,000", entitled "YAYI INTERNATIONAL INC. 9% CONVERTIBLE PROMISSORY NOTE." Since this action involves the breach of a single note, dated September 27, 2010, any reference to the "Notes" in the plural form, when referring to the September 27, 2010 note is

17

improper, ambiguous and confusing. As explained in more detail below, Chema's affidavit is inconsistent with and contradictory to the exhibits attached to it and, as such, does not support the vague and ambiguous contentions in the plaintiff's memorandum of law or the allegations in the first-amended complaint.

## *Fed. R. Civ. P. 54(c)*

In the demand clause of the first-amended complaint, the plaintiff requested the following damages: (i) "in its capacity as Investor Representative . . . $8,920,000.00 on Counts I and III of the Complaint"; (ii) "individually, . . . $1,000,000 on Count IV of the Complaint"; and (iii) "costs, expenses, and attorneys' fees Plaintiff incurred in prosecuting its claims." However, in the "Conclusion" section of its memorandum of law in support of the inquest on damages after default, the plaintiff seeks: (a) "$13,257,319.45 on the principal and interest on the Note"; (b) "$1,156.873.88 for reputational damages"; and (c) "$65,937.02 for attorneys' fees and costs." Under the section "The Notes," in its memorandum of law, the plaintiff explains that $13,257,319.45 includes "$8,920,000 (the Principal)" due on the note and "$4,337,319.45," which is "nine percent (9%) per annum interest . . . calculated from the date of the Notes, when interest commenced, through February 19, 2016." Under the section "Business Losses and Reputational Harm" in its memorandum of law, the plaintiff contends that $1,156,873.88 includes "$53,014.88 for business losses" and "$1,000,000 for reputational harm and lost profits, plus pre-judgment interest thereon in the amount of $103,859.00 calculated at the statutory rate of nine percent (9%) from the commencement of this action on January 16, 2015 through February 19, 2016."

The plaintiff's demand clause in the first-amended complaint does not include any demand for interest. It seeks "$8,920,000.00 on Counts I and III of the Complaint," "$1,000,000

18

on Count IV on the Complaint" and "costs, expenses and attorneys' fees." Moreover, the

plaintiff's demand clause request for "$1,000,000 on Count IV on the Complaint" is inclusive of

all losses asserted under "Count IV." Although in the first-amended complaint, the plaintiff

asserts that "Yayi's breach of contract with the Investors has actually and approximately caused

damages to the Investors in the amount of $8,920,000.00, together with interest thereof, all

reasonable costs and expenses (including reasonable legal fees) incurred in connection with the

enforcement and collection of the Note)," the plaintiff determined, for reasons presumably

known to the plaintiff, to include only "costs, expenses, and attorneys' fees," but not interest in

the demand clause. The plaintiff "could easily have drafted a complaint that included a distinct

claim for 'pre-judgment interest' in the demand clause" and, having failed to do so, the plaintiff

limited its damages to those requested in the demand clause of the complaint. Silge, 510 F.3d at

160. As the Second Circuit explained, Rule 54(c)

> is a sensible rule. Because complaints can be long and intricate, a lawyer is often
> required to help a defendant gain a full understanding of the plaintiff's claims. By
> limiting damages to what is specified in the "demand for judgment," the rule
> ensures that a defendant who is considering default can look at the damages clause,
> satisfy himself that he is willing to suffer judgment in that amount, and then default
> without the need to hire a lawyer.

Id.

Apart from the plaintiff's improper request for damages exceeding the amount and the

type of damages requested in the demand clause of the first-amended complaint, the plaintiff's

request, in its memorandum of law, for "$4,337,319.45," "nine percent (9%) per annum interest

. . . calculated from the date of the Notes, when interest commenced, through February 19,

2016," is not mentioned in Chema's affidavit and no evidence was submitted in its support.

Similarly, Chema's affidavit makes no mention of "$1,000,000 for reputational harm and lost

19

profits, plus pre-judgment interest thereon in the amount of $103,859.00 calculated at the

statutory rate of nine percent (9%) from the commencement of this action on January 16, 2015

through February 19, 2016," as asserted in the memorandum of law, and no evidence was

submitted in support of those requests.

The plaintiff's memorandum of law is internally contradictory because, under the section

"Business Losses and Reputation Harm," the plaintiff contends that it "suffered damages in the

amount of $53,014.88 for business losses," "$1,000,000 for reputational harm and lost profits,

plus pre-judgment interest thereon in the amount of $103,859," while seeking in the Conclusion

section "$1,156,873.88 for reputational damages" only.  However, it appears that "$1,156,873.88

for reputational damages" includes "$53,014.88 for business losses," "$1,000,000 for

reputational harm and lost profits, plus pre-judgment interest thereon in the amount of

$103,859.00."  Even assuming the plaintiff submitted evidence to support these amounts, which

it did not, "lost profits" and "business losses" are not the same as "reputational harm," absent

evidence to the contrary.

The Court finds that the plaintiff's damages after default, if any, cannot exceed the

amount and type of damages the plaintiff requested in the demand clause of its first-amended

complaint, namely" (1) "$8,920,000.00 on Counts I and III of the Complaint"; (2) "$1,000,000

on Count IV on the Complaint"; and (3) "costs, expenses and attorneys' fees Plaintiff incurred in

prosecuting its claims."

### *"First Cause of Action (Investors – for Breach of Contract)" and "Third Cause of Action (Investors – Breach of the Covenant of Good Faith and Fair Dealing)"*

Although Exhibit A to Chema's affidavit, the September 27, 2010, US $100,000 YAYI

INTERNATIONAL INC. 9% CONVERTIBLE PROMISSORY NOTE ("the Note") contains

20

what appears to be a signature by the defendant in this action, no acceptance signature by the Holder, Amy J Stefanik TTEE Amy J Stefanik Revocable Trust U/A 2/6/01, forms part of Exhibit A. Thus, no proof exists that the Holder of the Note agreed to the terms of the Note by accepting the Note, as required by the Note.

The Note states on its face, unambiguously, that Yayi International Inc. promises to pay to the Holder, Amy J Stefanik TTEE Amy J Stefanik Revocable Trust U/A 2/6/01, "the principal sum of ONE HUNDRED THOUSAND DOLLARS ($100,000) (the 'Principal') in lawful money of the United States of America, with interest payable thereon at the rate of nine percent (9%) per annum." This clear and unambiguous statement fails to support and contradicts Chema's contention in his affidavit that "Yayi promised to pay Investors a total of $8,920,000 (the 'Principal') at nine percent (9%) interest per annum." Chema did not explain the discrepancies between: (a) $100,000, the amount of the Note's principal, and $8,920,000, the principal alleged to be owed in Chema's affidavit and requested in the first-amended complaint; and (b) the clear and unambiguous language indicating that the Note is between Yayi International Inc. and the Holder, Amy J Stefanik TTEE Amy J Stefanik Revocable Trust U/A 2/6/01 and the assertion that the Note is between "the Investors and Yayi."

Chema's contention that "[t]he 'Minimum Amount' as cited in the Notes was closed upon the execution of the SPA" is not supported by any evidence. The Note states that the Maturity Date falls "on the three (3) year anniversary of the date of closing of the Minimum Amount." The Note provides that "[c]apitalized terms used herein but not defined herein shall have the meaning ascribed to them in that certain Securities Purchase Agreement dated of even date herewith (the 'SPA') pursuant to which the Holder is acquiring this Note." SPA defines "Minimum Amount" as "Units equal to at least the amount of $6,000,000 . . . required to be sold

21

at the First Closing **within the time period set forth in the Memorandum**." (emphases added).

SPA's Article 2.2(a) states that "the Company shall issue and sell to each Investor, and each such

Investor shall, severally and not jointly, purchase from the Company **on or before [*], 2010** (the

'First Closing Date') such number of Units set forth on the respective signature pages attached

hereto, which will be reflected opposite such Investor's name on Exhibit A (the 'First Closing')."

(emphases added). However, neither "the Memorandum," referenced in the Note and SPA, nor

Exhibit A to SPA are included in the plaintiff's submissions. Accordingly, no evidence exists

demonstrating the "First Closing Date" and, consequently, the date on which, if at all, the

minimum amount was closed that would trigger the maturity date of the Note. The plaintiff

failed to establish the maturity date of the Note, on which "[t]he principal amount . . . and all

accrued but unpaid interest thereon shall be paid in full to the Holder," as provided in the Note.

Without the maturity date, no basis exists to calculate the amount of damages, if any, "unless

[the] Note has been earlier converted or redeemed" pursuant to the terms of the Note.

Chema's contention, in a footnote to his affidavit, that "[t]o date the Investors have not

converted the debt to equity pursuant to the Note" is not supported by evidence. The September

27, 2010 SPA was made among Yayi International Inc., "the investors listed on the Schedule of

Investors attached hereto as Exhibit A and identified on the signature pages hereto (each, an

'Investor' and collectively, the 'Investors') and, with respect to certain sections hereof, Euro

Pacific Capital, Inc. (the 'Placement Agent')." SPA's signature page on which a signature by

Euro Pacific Capital, Inc. appears contains the following text:

> INVESTORS:
> The Investors executing the Signature Page in the form attached hereto as Annex
> A and delivering the same to the Company or its agents shall be deemed to have
> executed this Agreement and agreed to the terms hereof.
> Solely with respect to Sections 2.7, 5.1, 6.4, 6.5(a) and 6.8 herein:

INVESTOR REPRESENTATIVE:
EURO PACIFIC CAPITAL, INC.

Neither an "Annex A" nor an Exhibit A, "the Schedule of Investors," was submitted by the plaintiff that would identify the investors who executed SPA. Since the plaintiff provided no evidence that the investors the plaintiff alleged in the first-amended complaint it represents are the investors who executed SPA, Chema's contention that "[t]o date the Investors have not converted the debt to equity pursuant to the Note" is uncorroborated.

SPA is incomplete because it does not contain exhibits forming part of the entire agreement under SPA's Article 6.2, namely: (1) Exhibit A, the Schedule of Investors; (2) Exhibit B, the Registration Rights Agreement, among Yayi International Inc., "the Investors and the Investor Representative"; (3) Exhibit C, the terms and conditions of the "Registration Rights Agreement," as noted in SPA's Article 2.6; (4) Exhibit D, the "Make Good Escrow Agreement"; (5) Exhibit E, the "Series F Warrants" terms and conditions, as provided by SPA's Article 2.5; (6) Exhibit F, the "Notes" terms and conditions, as provided by SPA's Article 2.4; (7) "Annex A," as provided by SPA's signature pages; (8) "Transaction Documents," as provided in various SPA's sections, most notably Articles 6.1 and 6.2; and (9) the "Memorandum," referenced in the Note and as provided in various SPA's sections. Although SPA provides that Euro Pacific Capital, Inc. is the investor representative for "Investors" who executed SPA, the identities of the investors who executed SPA are unknown, and Chema's contention that the plaintiff "was the placement agent and Investor Representative" for various persons and entities named in the first-amended complaint and Chema's affidavit is not supported by evidence.

Chema's contention that "[t]o date the Investors have not converted the debt to equity pursuant to the Note" is also contradicted by the Note because the Note provides that only the

23

"Holder" of the Note "shall have the right, exercisable at any time prior to the Maturity Date, to convert all, but not less than all, of the principal amount then outstanding into shares of the Company's common stock," and the Holder of the Note is "AMY J. STEFANIK TTEE AY J STEFANIK REVOCABLE TRUST U/A 2/6/01," not "the Investors," as Chema asserts. Moreover, the plaintiff neither alleged nor presented any evidence showing that the Holder of the Note, "AMY J. STEFANIK TTEE AY J STEFANIK REVOCABLE TRUST U/A 2/6/01," has assigned, pledged or otherwise transferred the Note or any interest in the Note, as provided in Section 14 of the Note. Thus, it appears that Chema's assertion, "[t]o date the Investors have not converted the debt to equity pursuant to the Note," is not based on personal knowledge and he did not identify any other source of information that could be the source of his contention.

The clear and unambiguous language of the Note's Section 14 provides: "Interest and principal are payable only to the registered Holder of this Note on the books and records of the Company." The Note's Section 12 provides that, "in the event of an Event of Default," the defendant agrees "to reimburse the Holder for all reasonable costs and expenses (including reasonable legal fees of one counsel) incurred in connection with the enforcement and collection of this Note." The plaintiff failed to show what connection, if any, exists between the Holder and the investors the plaintiff claims to represent, except "AMY J. STEFANIK TTEE AY J STEFANIK REVOCABLE TRUST U/A 2/6/01," the Holder of the Note. However, no evidence exists that "AMY J. STEFANIK TTEE AY J STEFANIK REVOCABLE TRUST U/A 2/6/01," the Holder of the Note, is one of the investors who executed SPA. Absent evidence: (i) of the identities of the investors who executed SPA; and (ii) that the Holder of the Note assigned, pledged or otherwise transferred the Note or any interest in the Note to the investors who

24

executed SPA, it cannot be determined what, if any, relationship exists between the plaintiff, as the investors' representative, and the Holder of the Note.

Chema contends that "[s]ubsequent to the execution of the SPA, Yayi ceased filing with the SEC [Securities and Exchange Commission]" and "Yayi's last document filed was a NT 10-Q notification of its inability to timely file its 10-Q filed on August 15, 2012." However, Chema failed to support these contentions with any evidence and did not explain how he has personal knowledge of Yayi's actions or inactions or the date when the defendant filed "its 10-Q," given that Chema is the plaintiff's general counsel and not Yayi's employee or associate.

The Court finds that the plaintiff failed to establish, with reasonable certainty, the amount of damages it seeks in connection with its "First Cause of Action (Investors – for breach of contract" and "Third Cause of Action (Investors – Breach of the Covenant of Good Faith and Fair Dealing)."

### *"Fourth Cause of Action (Euro Pacific – Defendants' [sic] Breach of Contract – Third Party Beneficiary)"*

As the plaintiff seeks to recover on the Note, based on its SPA "third party beneficiary to the Note as the Investor Representative and Placement Agent" status, the plaintiff must establish a connection between the Note's Holder and the investors who executed SPA. As explained above, the plaintiff failed to identify the investors who executed SPA and their connection to the Note. Furthermore, Chema refers to SPA's Article 6.8 for his contention that "[i]n its capacity as Placement Agent, Plaintiff Euro Pacific is a third party beneficiary" to the Note and SPA. However, SPA's Article 6.8 only states that the investor representative "is an intended third party beneficiary of this Agreement and have [sic] all of the rights of an 'Investor' under the Agreement." SPA's Article 6.8 does not mention the Note and the plaintiff fails to point to any

25

term in SPA or the Note to support the proposition that the plaintiff is "a third party beneficiary to the Note." Chema contends that the plaintiff "suffered damages in the form of business losses," without identifying what those business losses are, or presenting any evidence supporting the amount requested, $53,014.88, or explaining what calculation he used to arrive at that amount. As explained above, no evidence exists in support of the contention that the plaintiff suffered "$1,000,000 for reputational harm and lost profits," the amount is not even mentioned in Chema's affidavit.

The Court finds that the plaintiff failed to establish, with reasonable certainty, the amount of damages it seeks in connection with its "Fourth Cause of Action (Euro Pacific – Defendants'[sic] Breach of Contract – Third Party Beneficiary)."

### *Attorney's Fees and Costs*

The plaintiff contends that, as a result of the defendant's breach of the Note, it incurred attorneys' fees and costs, referring to the Note's Section 12, which provides that "[t]he Company agrees . . . to reimburse the Holder for all reasonable costs and expenses (including reasonable legal fees of one counsel) incurred in connection with the enforcement and collection of this Note." The plaintiff concedes that the Note provides for reimbursement of the Note's "Holder" for "all reasonable costs and expenses (including reasonable legal fees of one counsel)." The plaintiff did not present any evidence that it is the Holder of the Note, as required by the Note to recover "all reasonable costs and expenses (including reasonable legal fees of one counsel)." As explained above, the plaintiff failed to show any connection between the Note and SPA, pursuant to which the plaintiff acts as the investors' representative or that the investors the plaintiff claims it represents are the investors who executed SPA. Moreover, the plaintiff failed to explain the basis for seeking attorneys' fees for more than "one counsel," which is all that the Note provides.

26

Ayers states, in his affirmation, that he is the plaintiff's attorney, without providing any information about his experience, reputation and ability, or addressing any factors required under New York law to be considered by a court when assessing the reasonableness of an attorney's fee request. Ayers contends that "[t]he billing rates for the attorneys, law clerks, and paralegals working on the instant litigation ranged from $150 per hour for a paralegal to $715 per hour for a partner," referring to Exhibit A, which he claims is "a chart outlining the total fees and costs to date related to this Action." Ayers did not identify what persons whose hours are listed in Exhibit A are attorneys, partners, law clerks and paralegals. Exhibit A does not indicate billing hours. However, the "Bill Amount" for each person listed and the "Bill Hours" for that person indicate the following: (1) Laura Kuck billed $294 for 1.20 hours, resulting in an hourly rate of $245; (2) David Graff billed $4,912.50 for 13.10 hours, resulting in an hourly rate of $375; (3) Rachael Kierych billed $4,375 for 17.50 hours, resulting in an hourly rate of $250; (4) Christopher Paolino billed $14,275 for 57.10 hours, resulting in an hourly rate of $250; (5) Allen Wolff billed $2,137.50 for 5.70 hours, resulting in an hourly rate of $375; (6) Alexander Litt billed $17,875.00 for 71.50 hours, resulting in an hourly rate of $250; (7) Ayers billed $16,875 for 67.50 hours, resulting in an hourly rate of $250; (8) Ryan Rackhow billed $405 for 3 hours, resulting in an hourly rate of $135; and (9) Brooke Ford billed $900 for 4.50 hours, resulting in an hourly rate of $200. Thus, Ayers's contention that "[t]he billing rates for the attorneys, law clerks, and paralegals working on the instant litigation ranged from $150 per hour for a paralegal to $715 per hour for a partner" is contradicted by Exhibit A to his affirmation, which shows that the billing rates range from $135 to $375 for the hours the nine persons listed in Exhibit A claim they expended in connection with this action. Not only did Ayers fail to identify what persons listed in Exhibit A are attorneys, partners, law clerks and paralegals, but he also failed to provide

27

any information about their experiences, reputations and abilities. Furthermore, Ayers failed to present any evidence of "the customary fee charged by the Bar for similar services." Estate of Freeman, 34 N.Y.2d at 9, 355 N.Y.S.2d at 341. Thus, no basis exists to assess the reasonableness of those persons' rates and hours alleged to have been expended in connection with this action. For the foregoing reasons, the Court finds that an award of attorneys' fees and costs is not warranted.

## RECOMMENDATION

For the foregoing reasons, I recommend that no damages be awarded to the plaintiff.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Vernon S. Broderick, 40 Centre Street, Room 415, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 425, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Broderick. *Failure to file objections within fourteen (14) days will result in a waiver of objections and will preclude appellate review.* See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York
February 13, 2017

Respectfully submitted,

*Kevin Nathaniel For*

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

28